# EXHIBIT A



# ADMINISTRATIVE FINANCIAL ACCOUNTING REPORT

## Charmed Life Guitar Picks & Accessories, ("Charmed Life")

Prepared in Response to the April 9, 2026 Order of the United States District Court, Central District of California

### Case No. 2:25-cv-03167-RGK-AS

*Blue Chip Machining, Inc. v. Scott Memmer et al.*

| Prepared by | Prepared by Scott Memmer, Owner / President / Records Custodian |
|---|---|
| Capacity | Owner / President / Records Custodia |
| Date of Report | May 11, 2026 |
| Reporting Period | March 1, 2016 through the date of this report |
| Purpose | Good-faith financial accounting in response to Section 2 of the Court's April 9, 2026 Order (ECF No. 122) |
| Document Type | Administrative business record / accounting statement (factual) |



## 1. GOOD-FAITH STATEMENT

I, Scott Memmer, owner and records custodian of Charmed Life Guitar Picks & Accessories ("Charmed Life" or "the Company"), prepare this Administrative Financial Accounting Report in good faith in response to the Court's April 9, 2026 Order requiring an accounting under oath.

I have compiled an owner-prepared year-by-year summary of total unit sales and polyimide unit sales covering the reporting period from tax year 2016 through tax year 2026 year-to-date. That summary is set forth in Section 9 below and is intended to assist in identifying the portion of Charmed Life's sales attributable to polyimide products as compared with non-polyimide product lines.

I have also reviewed the available Schedule C / federal tax records, WIX records, owner-prepared sales summaries, and currently available expense information. Where figures are drawn from tax records, WIX records, owner-prepared summaries, reconstructed estimates, or pending documentation, I identify the source or status of the information so that the accounting is transparent and not overstated.

Certain records remain unavailable or incomplete. The 2018 Schedule C is unavailable because the electronic copy was corrupted and the paper copy suffered severe water damage. The 2025 federal tax return has not yet been filed, so no Schedule C exists for 2025. However, I have prepared owner-level WIX unit summaries for both 2018 and 2025, which assist with product-level unit analysis for those years. The 2019 Schedule C is available at the summary level only; the itemized continuation statements for 2019 cannot presently be located.

I am continuing to assemble additional supporting records, including PayPal records, reseller/wholesale records, direct-sale records, event-sale records, bank statements, supplier and outside-processing invoices, shipping records, and equipment purchase records. I do not identify Amazon as a sales channel for Charmed Life products; Amazon-related references in this Report, if any, relate to business purchases or expense records rather than product sales. If I identify additional material records after service of this Report, I will review them and supplement the accounting as appropriate.

## 2. PURPOSE AND SCOPE

This Report responds to Section 2 of the Court's April 9, 2026 Order (ECF No. 122), which directs Defendants to serve an accounting under oath setting forth: (a) all gross revenues derived from the sale of products bearing or incorporating the infringing marks, including polyimide guitar picks bearing brown coloration or a brown body with contrasting lighter-colored lettering; (b) the time period covered by such sales, including all sales from March 2016 to the present; (c) all costs and expenses Defendants contend should be deducted from gross revenues in determining profits, with supporting documentation; and (d) any other information relevant to the calculation of Defendants' profits from the alleged infringing activities.

The reporting period covered by this Report is March 1, 2016 through the date of this Report. I have prepared owner-generated year-by-year summaries for the reporting period, including years for which Schedule C records are unavailable or not yet filed, such as 2018 and 2025. I identify these summaries as owner-prepared, and they remain subject to reconciliation against the underlying WIX records, paper logs, PayPal records, reseller/wholesale records, direct-sale records, event-sale records, bank records, and other supporting documentation.

For clarity, this Report distinguishes among gross revenues, profits, business-level tax results, and product-level profit analysis. Gross revenues are amounts received from customers before costs or deductions. Profits are gross revenues less costs and deductions properly attributable to the activity at issue. Business-level losses reflected on Schedule C records are tax-return figures calculated at the entity/business level and do not, by themselves, allocate revenue, expenses, profits, or losses between the polyimide/Vespel product lines and the Company's non-polyimide product lines. I therefore develop product-level profit analysis separately from item-level WIX records, SKU classification, paper logs,

PayPal records, reseller/wholesale records, direct-sale records, event-sale records, and other product-level inputs. This Report addresses both business-level and product-level information while keeping those concepts distinct.

## 3. BUSINESS OVERVIEW

Charmed Life is a small, owner-operated boutique guitar-pick business. I design and assemble handcrafted guitar picks in low volumes, primarily for niche players and collectors. Charmed Life is not, and has never operated as, an industrial manufacturer.

My production process has historically involved a combination of: (i) sourcing raw rod stock and sheet stock from material suppliers; (ii) sending rod and sheet stock to laser-cutting and machining vendors for blank cutting, deburring, grinding, flattening, and tumble polishing; and (iii) finishing the picks by hand in my workshop, including hand-beveling, hand-polishing, inspection, packaging, and shipping. I use outside processors because Charmed Life does not own industrial CNC equipment. Vendors used during the documented years include California Lasers Inc., A.R. Warner, Venture Precision, Drees Grinding, and Randy's Deburring, among others.

During the documented period, my principal customer-facing sales channel has been Charmed Life's e-commerce store hosted by Wix.com ("Wix"), with additional limited sales handled through PayPal, direct-to-customer fulfillment, reseller/wholesale transactions, and event-based channels. Charmed Life did not sell its products through Amazon; Amazon was used for certain business purchases and expense items, not as a product-sales channel.

My order-fulfillment workflow is, by my own description, "old-school." I have historically maintained handwritten paper order logs, individually printed invoices, individually printed postage labels, and manual order-processing records. Inventory has not been tracked on a perpetual basis. I did not maintain formal time records for owner labor. Shipping cost was generally absorbed by Charmed Life without being separately invoiced to customers. These features are typical of a small handcrafted operation but are relevant to interpreting the figures in this Report.

As reflected in the year-by-year summary in Section 9 below, Charmed Life's overall annual unit volume has ranged from approximately 350 units in 2016 to approximately 1,200 units in 2024, with year-to-date 2026 volume at 113 units through the date of this Report. Polyimide-line unit volume has ranged from approximately 51 units in 2016 to approximately 117 units in 2025, including both Vespel SP-1 and SCP-5000, averaging roughly 79 polyimide units per year across the reporting period. The polyimide line is a low-volume specialty line within Charmed Life's overall business.

## 4. DATA SOURCES REVIEWED
In preparing this Report, I have reviewed the following records to date:

| SOURCE | PERIOD | STATUS |
|---|---|---|
| Owner-prepared year-by-year WIX summary (total unit sales, Vespel SP-1 unit sales, SCP-5000 unit sales, polyimide percentage by year) | 2016–2026 YTD | Received and reflected in Section 9; used for year-by-year product-level analysis and polyimide percentage calculation. |
| WIX item-level reports (annual reports prepared by owner from WIX exports, including SKU and quantity-level detail) | 2016–2026 | Supports the year-by-year summary in Section 9 |
| WIX transaction-item exports | 2021–2025 | Reviewed and tabulated for 2021–2025; retained for reconciliation against Schedule C records, WIX gross |

| SOURCE | PERIOD | STATUS |
|---|---|---|
| | | sales, refunds, sales-tax treatment, and owner-prepared SKU summaries. |
| Schedule C / federal tax records | 2016, 2017, 2019, 2020, 2021, 2022, 2023, 2024 | Received and reviewed; document-supported business-level gross receipts, expenses, and net losses; SSN and other personal identifiers must be redacted before any service or filing |
| 2018 federal tax records | 2018 | Missing/unavailable: electronic copy corrupted and paper copy water-damaged; owner-prepared 2018 unit-level WIX summary is now available (see Section 9) |
| 2025 federal tax records | 2025 | Not yet filed; 2025 owner-prepared unit-level WIX summary is now available (see Section 9); |
| Schedule C itemized Other Expenses continuation statements | Available for several years | Received for some years; 2019 itemized continuation statements presently missing |
| Paper order logs | 2016–2020 and early business years | Owner-maintained contemporaneous logs; being manually tabulated; supports pre-2021 reconstruction |
| PayPal, reseller/wholesale, direct-sale, and event-sale records | 2016–present (target) | Being retrieved or manually reconstructed; may corroborate limited non-WIX sales, reseller/wholesale transactions, direct sales, event-based sales, platform fees, and related transaction costs. |
| California Lasers Inc. invoice (Inv. 32998, 8/16/2019, paid 8/20/2019, $1,673.16) | August 2019 | Document-supported; reflected in Sections 9 and 11 |
| Recent DuPont Vespel rod stock quote | 2024–2026 (date of quote) | Document-supported (current replacement value); not historical acquisition cost |
| Bank statements / merchant deposits | 2016–present (target) | Being retrieved |
| Shipping records (USPS, UPS, Pirate Ship, ShipStation, PayPal-shipping) | 2016–present (target) | Being retrieved |
| Equipment purchase records (laser cutter and related) | 2016–present (target) | Some entries appear in Schedule C continuation statements (e.g., 2017 "Tumbling/polishing machines: $150"; "Electric tools and shop machinery: $1,928"); supporting receipts being retrieved |
| My statements regarding production methodology, material consumption, labor, and per-unit cost | 2016–present | Provided in Sections 11–13 |
| SCORE financial advisors | Ongoing consultation | I am consulting SCORE for methodology guidance; SCORE has not prepared or approved this Report. |

## 5. DATA LIMITATIONS

This Report is constrained by the following limitations, which I disclose in the interest of transparency.

**2018 unit-level data.** Although the 2018 Schedule C remains unavailable, I have compiled an owner-prepared WIX unit summary for 2018, identifying total 2018 unit sales of 850 units and 2018 polyimide unit sales of 109 units. This information is reflected in Section 9 below. The 2018 revenue and net profit/loss figures remain subject to reconstruction from available WIX records, paper logs, PayPal records, reseller/wholesale records, direct-sale records, event-sale records, bank records, and other supporting documentation.



**2025 unit-level data** Although the 2025 Schedule C will not exist until the 2025 federal tax return is prepared and filed, I have compiled an owner-prepared WIX unit summary for 2025, identifying total 2025 unit sales of 1,090 units, including 60 Vespel SP-1 units and 57 SCP-5000/Gauntlet polyimide units. This information is reflected in Section 9 below. The 2025 revenue and net profit/loss figures remain subject to year-end tax preparation and reconciliation.

**Year-by-year polyimide percentage.** My current owner-prepared summary provides polyimide unit counts and polyimide percentages for each year from 2016 through 2026 year-to-date. These figures provide year-by-year inputs for the Annual PI/Polyimide Percentage Allocation Method described in Section 10, while remaining subject to reconciliation against the underlying WIX item-level records and other supporting documentation.

**Limited reseller/wholesale transactions.** Charmed Life had a small number of reseller/wholesale transactions during the reporting period. Based on my current understanding, those transactions were limited in volume and require manual reconstruction from available records. I will supplement this accounting if a detailed reseller/wholesale reconstruction is later completed or requested.

**Limited cash-only event sales.** Charmed Life displayed products at only a limited number of outside events during the reporting period, including the 2017 Topanga Banjo & Fiddler Contest, the 2023 Wintergrass Festival in Seattle, Washington, and the California Bluegrass Festival in June 2024. Sales at those events were cash-based, limited, and not maintained in the same manner as WIX records. I understand those events to have been non-profitable or money-losing after travel, lodging, and related expenses are considered. I will supplement this accounting if additional event-specific records are located or requested.

**Blems, seconds, and fundraising models.** Charmed Life also sold limited quantities of blems and seconds below wholesale cost and used two PI models in connection with sea-turtle rescue fundraising. Those categories have not yet been separately quantified and would require manual reconstruction. I will supplement this accounting if those figures are later requested or reconstructed.

## 6. DEFINITIONS AND METHODOLOGY

Every numerical figure in this Report is identified as one of the following:

| Label | Meaning |
|---|---|
| Document-supported | Drawn directly from a contemporaneous record, such as a Schedule C, a WIX export, or a vendor invoice |
| Owner-prepared summary | Compiled by the owner from the underlying contemporaneous WIX item-level records; the owner has direct visibility to the underlying records but the summary itself was prepared after the fact |
| Owner statement | Provided by me, Scott Memmer, based on my direct personal knowledge of business operations; not yet corroborated by a contemporaneous document |
| Reconstructed estimate | Calculated from owner methodology applied to documented inputs (for example, kerf-loss calculation; per-unit labor allocation) |
| Proportional PI allocation | A figure produced by applying the Annual PI/Polyimide Percentage Allocation Method (Section 10) to a shared shop expense, in order to derive a PI-attributable component |
| Sensitivity scenario | Modeled for illustrative purposes only; not asserted as historical fact |
| Pending documentation | Identified as a category that is being supplemented as records are retrieved |

 

## 7. SCHEDULE C BUSINESS-LEVEL FINANCIAL SUMMARY

The following table summarizes the document-supported Schedule C records produced to date based on the available federal tax records and my current reconciliation of those records.

### 7.1 Schedule C Business-Level Gross Receipts, Expenses, and Net Profit/Loss

| Tax Year | Business / Activity | Gross Receipts | Net Profit / (Loss) |
|---|---|---|---|
| 2016 | Charmed Life Guitar Picks & Songwriting / Charmed Life Guitar Picks & Accessories | $15,655 | ($25,064) |
| 2017 | Charmed Life Guitar Picks | $16,273 | ($2,797) |
| 2018 | — | Unavailable | Unavailable |
| 2019 | Charmed Life Guitar Picks | $16,644 | ($4,729) |
| 2020 | Music Accessory Manufacturing / Charmed Life Guitar Picks | $17,729 | ($5,611) |
| 2021 | Music Accessory Manufacturing / Charmed Life Guitar Picks | $14,105 | ($11,522) |
| 2022 | Music Accessory Manufacturing / Charmed Life Guitar Picks | $22,000 | ($20,562) |
| 2023 | Music Accessory Manufacturer / Charmed Life Guitar Picks | $29,220 | ($7,699) |
| 2024 | Music Accessory Manufacturer / Charmed Life Guitar Picks | $36,062 | ($7,230) |
| 2025 | — | Unfiled (return not yet prepared) | Unfiled |
| 2026 YTD | Charmed Life Guitar Picks (year-to-date) | $5,953 (owner summary, not yet on Schedule C) | Pending year-end |
| Aggregate (8 available Schedule C years) | 2016, 2017, 2019, 2020, 2021–2024 | $167,688 | ($85,214) |

*Note: Business-Use-of-Home (Schedule C Line 30) was blank / not claimed in every year for which a Schedule C is available. See Section 12.3.*

**Important note on the proper use of these figures.** The Schedule C records show that Charmed Life reported recurring business-level losses in every available tax year. Across the eight Schedule C years available, gross receipts total approximately $167,688 and net losses total approximately $85,214. However, Schedule C records are business-level tax records. They do not, standing alone, allocate revenue, expenses, profits, or losses between the accused PI/polyimide/Vespel products and Charmed Life's non-accused product lines. I respectfully submit that the Schedule C records should accordingly be used as aggregate corroboration of Charmed Life's overall financial condition and expense structure, confirming, for example, that the business has consistently operated at a loss, while product-level profit analysis must still be built up from WIX item-level reports, SKU classification, paper logs, PayPal records, reseller/wholesale records, direct-sale records, event-sale records, and the owner-confirmed product classification reflected in Section 9 below.

 

**7.2 Selected Itemized Expense Categories from Schedule C Continuation Statements**

The Schedule C continuation statements (Line 48 / Other Expenses) include, among others, the following entries. These illustrate the categories of expense Charmed Life has historically incurred.

**Tax year 2016 (selected entries from the Line 48 continuation):** A.R. Warner cutting Vespel rod $1,262; Venture Precision Vespel & DPEEK CNC $1,878; Drees Grinding $880; California Laser cutting casein sheets and tumbling $1,431; Randy's Deburring $125; Rebecca Chou CAD designing $200; Kulak's Studio room rental for pick videos/demos $300; Jake Kelly guitarist samples $150; Tom Corbett mandolin samples $150; tarp for event booth $51; Martin guitar case $99; Thinkpad laptop $400; computer mice $29; 818 PC service / laptop $567; Cricket Wireless $490; Amazon Prime $100; Kulak's bass rental for Mark Memmer $145.

**Tax year 2017 (selected entries from the Line 48 continuation):** DuPont Vespel rods $996; tumbling/polishing machines $150; electric tools and shop machinery $1,928; insurance (shop) $394; Wix website services $240; Music Space studio rental $200; Albert Tapia website design $200; AGF sponsorship $99; PayPal fees $606; PayPal chargebacks $87; international wire transfer charges $116; miscellaneous PayPal chargebacks $62; PayPal shipping fees $806; business cards / Vistaprint $90; printer toner and ink $212; storage $176; software $78; Amazon Prime $100; Google Music $119; cables $68; PC service Win 7 HP laptop $300; PC service Win 7 Lenovo laptop $275; Jake Kelly guitarist $200; Phil Salazar mandolin $200; Matt Curoc sound mixing $100; guitar accessories $336; guitar repair / setups $360; guitar pedals and pickups $465; audio CDs $76; food for jams and events $388.

**Tax year 2020 (Schedule C category-level):** advertising $99; contract labor $175; insurance $700; mortgage interest $831; legal and professional services $1,350; office expense $2,428; supplies $876; travel $720; utilities $2,029; other expenses $14,132.

**Tax year 2021 (selected Line 48 continuation):** "Samples (143 × $15.00) = $2,145"; total Line 48 of $22,202.

**Tax year 2024 (Schedule C category-level):** utilities $1,250; legal and professional services $120; other expenses (Line 48) $41,922.

## 8.  RECONCILIATION OF SCHEDULE C, WIX, PAPER LOGS, PAYPAL, RESELLER/WHOLESALE, DIRECT-SALE, EVENT-SALE, AND PRODUCT-LEVEL RECORDS

**8.1 Schedule C Gross Receipts versus WIX Gross Sales (2021–2024)**

For the four years where both Schedule C and WIX exports are available, the Schedule C gross receipts and the WIX gross sales do not match exactly. The Schedule C figure is consistently higher than the WIX figure:

| Year | Schedule C Gross Receipts | WIX Gross Sales (export) | Difference |
|------|---------------------------|--------------------------|------------|
| 2021 | $14,105 | $12,497.63 | $1,607.37 |
| 2022 | $22,000 | $19,890.85 | $2,109.15 |
| 2023 | $29,220 | $24,271.12 | $4,948.88 |
| 2024 | $36,062 | $31,663.15 | $4,398.85 |



| Year | Schedule C Gross Receipts | WIX Gross Sales (export) | Difference |
|---|---|---|---|
| Total 2021–2024 | $101,387 | $88,322.75 | $13,064.25 |

These differences are consistent with sales channels outside the WIX storefront together with platform-level reporting differences. The principal drivers are: non-WIX sales, including PayPal direct sales, reseller/wholesale transactions, direct-to-customer fulfillment, and limited event-based sales reflected on Schedule C deposits but not captured by WIX exports; timing differences between WIX transaction reporting and Schedule C cash- or accrual-basis treatment; refunds and discount treatment; sales-tax treatment; shipping treatment; and, in some years, broader Schedule C business descriptions.

### 8.2 Source-Strength Hierarchy

I apply the following source-strength hierarchy when developing product-level analysis.

WIX item-level records are the strongest source for SKU and product-level classification, because they are line-item records identifying the listing name, SKU, quantity, and gross sales by item. My owner-prepared year-by-year summary in Section 9 derives from those records.

Schedule C records are the strongest source for annual business-level income and expense corroboration, because they are filed under penalty of perjury and reflect the Company's overall financial condition.

Paper order logs are a useful secondary source for early-year product-level reconstruction, particularly for 2016–2020, and are being manually tabulated.

PayPal records, reseller/wholesale records, direct-sale records, and event-sale records may corroborate limited non-WIX sales and reflect platform fees, processor fees, shipping fees, cash-sale limitations, travel-related event costs, and other transaction costs that affect actual profit but that may not appear in a WIX transaction-item export. They also explain a portion of the Schedule C-versus-WIX reconciling difference.

No single source should be treated as complete on its own until reconciled against the others. I am in the process of completing this reconciliation and will supplement this Report as the cross-source review is finalized.

## 9. WIX / SKU / PRODUCT CLASSIFICATION — OWNER-PREPARED YEAR-BY-YEAR SUMMARY

### 9.1 Owner-Stated SKU Convention

I state that all of Charmed Life's polyimide / Vespel pick model numbers begin with the SKU prefix "cl" (for "Charmed Life"). Within the polyimide line, certain SKUs correspond to Vespel SP-1 (the standard polyimide grade addressed by the Court's Order) and certain SKUs correspond to SCP-5000, which is the polyimide grade used in the Company's separate "Gauntlet" specialty line. All other SKU prefixes correspond to non-polyimide product lines, principally casein (in numerous color lines, including "flame," "cabernet," "chianti," "cerulean," "tortoise," and "conch shell"), aerospace polymer / thermoplastic, and TruGrass. I have applied this convention to compile the year-by-year summary set forth below.

### 9.2 Owner-Prepared Year-by-Year Summary (2016–2026 YTD)

Administrative Financial Accounting Report — Charmed Life — Case No. 2:25-cv-03167-RGK-AS

| YEAR | TOTAL UNITS (ALL MODELS) | VESPEL SP-1 UNITS | SCP-5000 UNITS | TOTAL POLYIMIDE UNITS | POLYIMIDE % OF TOTAL UNITS |
|---|---|---|---|---|---|
| 2016 | 352 | 51 | — | 51 | 14.49% |
| 2017 | 709 | 87 | — | 87 | 12.27% |
| 2018 | 850 | 109 | — | 109 | 12.82% |
| 2019 | 962 | 90 | — | 90 | 9.36% |
| 2020 | 931 | 98 | — | 98 | 10.53% |
| 2021 | 689 | 55 | — | 55 | 7.98% |
| 2022 | 1,119 | 75 | — | 75 | 6.70% |
| 2023 | 955 | 80 | — | 80 | 8.38% |
| 2024 | 1,213 | 55 | 16 | 71 | 5.85% |
| 2025 | 1,090 | 60 | 57 | 117 | 10.73% |
| 2026 YTD | 113 | 22 | 18 | 40 | 35.40% |
| **TOTAL 2016–2026 YTD** | **8,983** | **782** | **91** | **873** | **9.72%** |

*\* The owner-prepared summary separately reported 18.80%, but that figure does not match the unit-count calculation and remains subject to reconciliation.*

*Source: Owner-prepared year-by-year WIX summary, prepared by me from underlying WIX item-level records using the SKU convention described in Section 9.1. Label: Owner-prepared summary derived from WIX records. Subject to confirmation against the underlying WIX item-level reports being produced.*

### 9.3 Headline Observations from the Year-by-Year Summary

Three headline observations emerge from my owner-prepared year-by-year summary.

First, polyimide products account for a low share of overall unit volume. Across the eleven years from 2016 through 2026 year-to-date, polyimide units, including Vespel SP-1 and SCP-5000, total 873 units out of 8,983 total units, representing an aggregate polyimide share of 9.72%. The annual polyimide share has ranged from a low of 5.85% in 2024 to a high of 35.40% in 2026 year-to-date, which is based only on a partial-year sample. In every completed year of the reporting period, polyimide products represented a minority share of total unit volume, and in most completed years they represented less than 13% of total unit volume.

Second, polyimide unit volumes have been small in absolute terms. Annual Vespel SP-1 unit sales have ranged from 51 units in 2016 to 109 units in 2018, with the most recent completed-year figure, 2025, showing 60 Vespel SP-1 units. SCP-5000/Gauntlet unit sales, where present, ranged from 16 units in 2024 to 57 units in 2025. Combined polyimide unit sales averaged approximately 79 units per year across the reporting period.

Third, I understand the Court's April 9, 2026 Order to be directed specifically to polyimide guitar picks bearing brown coloration or a brown body with contrasting lighter-colored lettering. The non-polyimide unit volume reflected in the table above — 8,110 units across the reporting period, consisting of casein product lines, aerospace polymer / thermoplastic products, TruGrass, and other non-polyimide products — falls outside that material description on its face. For that reason, I respectfully submit that any

disgorgement analysis should be limited to revenues attributable to the products described in the Court's Order and should not extend to non-polyimide product lines.

### 9.4 Status of the SCP-5000 (Gauntlet) Line

SCP-5000 is the polyimide grade I use in Charmed Life's separate "Gauntlet" specialty product line. The Gauntlet line first appears in the year-by-year summary in 2024, with 16 units; grows materially in 2025, with 57 units; and represents 18 of the 113 units sold in 2026 year-to-date. I identify this category separately for transparency, but I respectfully take the position that the Gauntlet line is Charmed Life's distinct premium / specialty product line and is not the line described in the operative Second Amended Complaint or in the Court's Order. I separately identify Gauntlet/SCP-5000 units in Section 9.2 to facilitate the Court's review, without conceding that the Gauntlet line falls within the scope of the injunction or the accounting.

## 10. ANNUAL PI / POLYIMIDE PERCENTAGE ALLOCATION METHOD

I propose the following methodology for allocating shared shop expenses to the accused product line. The methodology is intended for shared expenses that are not directly traceable to a specific product line — for example, abrasives, sandpaper, polishing and buffing materials, tumbling media, general shop supplies, and similar consumables that are used across both polyimide and non-polyimide production. Direct PI costs (for example, an invoice specifically for Vespel rod stock, or an outside-processing invoice that itemizes "brown polyimide picks") should be assigned directly rather than proportionally.

### 10.1 Steps

Step 1. Determine the annual total units sold from the year-by-year summary in Section 9.2.

Step 2. Determine the annual polyimide units sold (Vespel SP-1 plus SCP-5000) for the same year, from the year-by-year summary in Section 9.2.

Step 3. Calculate the annual polyimide percentage as polyimide units divided by total units.

Step 4. For shared shop expenses that cover multiple product lines, multiply the total annual shared expense by the annual polyimide percentage to derive the polyimide-allocated portion.

Step 5. Divide the polyimide-allocated portion by the annual polyimide units to derive a per-polyimide-unit shared-cost allocation.

### 10.2 Formula

| Annual Shared Expense × Annual Polyimide Unit Percentage = Polyimide-Allocated Expense |
| --- |
| Polyimide-Allocated Expense ÷ Annual Polyimide Units = Per-Polyimide-Unit Allocated Expense |

### 10.3 Year-by-Year Allocation Inputs

My owner-prepared year-by-year summary in Section 9.2 provides the inputs required to apply this allocation method on a year-by-year basis for the reporting period. Once year-by-year shared shop expenses have been finalized from the underlying records, those expenses can be multiplied by the corresponding annual polyimide percentage to derive the polyimide-allocated portion for each year. I will supplement this Report with the year-by-year application of the methodology once the shared-expense compilation is finalized.

## 10.4 Limits of the Proportional Method

Proportional allocation is appropriate for shared shop expenses but is not appropriate for expenses that are wholly unrelated to the accused product line, for direct costs that can be assigned to a specific product line on a documentary basis, or for expenses that should be excluded entirely (Section 12). Proportional allocation also assumes that consumption of the shared expense is roughly proportional to unit count; where a shared expense is materially more concentrated on a non-polyimide line, the proportional method will overstate the polyimide portion and a direct review of the underlying invoice should be undertaken instead.

## 11. RECONSTRUCTED PER-UNIT COST FRAMEWORK (OWNER-RECONSTRUCTED)

I have developed the following reconstructed per-unit cost framework for the accused polyimide / Vespel product line. The framework is a methodological tool, not a substitute for documentary support. Each component is identified by its evidentiary status. I intend this framework to apply to the accused product line, not to Charmed Life's non-accused lines.

### 11.1 Components

| COMPONENT | RECONSTRUCTED AMOUNT | BASIS | EVIDENTIARY STATUS |
|---|---|---|---|
| Material (Vespel SP-1 rod stock) | $14.61 per pick | Section 11.2 below; recent DuPont quote applied to reconstructed material consumption (≈ 3.0 mm per pick including ≈ 2.0 mm kerf loss) | Reconstructed estimate; recent DuPont quote is document-supported; historical $2,500 cash purchase remains owner statement |
| Production labor (hand-finishing: inspection, sorting, beveling, polishing, packaging-side finishing) | $15.00 per pick | $30/hour × 0.5 hour (30 minutes) per pick | Reconstructed estimate; no contemporaneous time records |
| Shipping (carrier postage and shipping materials, absorbed by the Company) | $3.00 per pick | Owner statement of historical absorbed-shipping methodology | Owner statement; pending USPS/UPS/Pirate Ship/ShipStation/PayPal-shipping reconciliation |
| Logging / packing / post-office fulfillment labor | $7.50 per pick | $30/hour × 0.25 hour (15 minutes) per order/pick; reflects manual logging, individual invoice, individual postage label, packing, and post-office handling | Reconstructed estimate; no contemporaneous time records |
| **Reconstructed per-unit cost (before additional costs)** | **$40.11 per pick** | **Sum of the above** | **Reconstructed estimate** |

This $40.11 per-unit figure is presented before additional costs that materially affect actual profit, including: WIX platform fees; Stripe and PayPal payment-processing fees; PayPal chargebacks and chargeback recovery costs; outside-processing invoices not already absorbed by the material line (laser cutting, deburring, grinding, flattening, polishing); packaging materials beyond shipping postage itself; helper or contract-labor payments where applicable; equipment cost and depreciation; shop insurance; storage; software; office expenses; utilities (where shared with the workspace); and applicable state and federal taxes. As to many of these categories, supporting amounts appear in the Schedule C continuation statements summarized in Section 7.2.

## 11.2 Material Cost Methodology — Vespel / Polyimide

I use DuPont Vespel SP-1 polyimide rod stock as raw material for Charmed Life's accused polyimide product line. My reconstructed material cost analysis is summarized below.

| INPUT | VALUE | LABEL |
|---|---|---|
| Number of Vespel SP-1 rods purchased in 2016 | 9 rods | Owner statement |
| Approximate rod dimensions | ≈ 38 in. × 1.50 in. diameter | Owner statement / industry-typical |
| Reported 2016 acquisition cost (cash purchase) | ≈ $2,500 per rod | Owner statement (no contemporaneous receipt located) |
| Reported 2016 list-price equivalent for new rod | ≈ $3,300 per rod | Owner statement |
| Recent DuPont quote for comparable rod | ≈ $4,700 per rod | Document-supported |
| Material consumption per pick (including kerf loss) | ≈ 3.0 mm per pick | Owner-reconstructed methodology |
| Of which: saw-blade kerf loss | ≈ 2.0 mm per pick | Owner-reconstructed methodology |
| Resulting reconstructed material cost | ≈ $14.61 per pick | Reconstructed estimate |

Independent corroboration of Vespel rod activity in the early years appears in the 2017 Schedule C Line 48 continuation, which lists "DuPont Vespel rods $996" as an itemized expense. The 2016 Schedule C Line 48 also reflects substantial outside-processing of Vespel rod stock — "A.R. Warner cutting Vespel rod $1,262" and "Venture Precision Vespel & DPEEK CNC $1,878" — confirming that Vespel rod was being purchased and processed in 2016. These figures are document-supported and corroborate the existence and order-of-magnitude cost of Vespel rod stock activity in the early years, even though they do not, standing alone, prove the historical $2,500 acquisition price.

## 11.3 Implication of the $40.11 Reconstructed Cost vs. Early $30 Retail Price

I sold early Vespel/polyimide picks at retail for $30.00 in 2016. Comparing that historical retail price to the $40.11 reconstructed per-unit cost developed above suggests that early Vespel/polyimide sales may have been sold at or below cost on a fully reconstructed basis, even before accounting for additional expenses such as WIX, Stripe, and PayPal platform or processing fees, packaging materials, additional outside-processing charges, equipment allocation, helper labor, and applicable taxes. I do not present this observation as conclusive proof of a per-unit loss in the early years. Rather, I offer it as a working observation, subject to further product-level reconciliation and corroboration through paper logs, PayPal records, supplier invoices, outside-processing invoices, and other available supporting records.

The available Schedule C records are consistent with this working observation at the business level. Across the eight available Schedule C years, I reported aggregate gross receipts of approximately $167,688 and aggregate net losses of approximately $85,214. As Section 7 explains, business-level losses are not the same as product-level losses and do not, by themselves, establish the profitability or lack of profitability of any specific product line. Nevertheless, the Schedule C pattern of recurring multi-year losses is consistent with, and not contradicted by, my working observation that the polyimide line has not been a profit center for the Company on a fully reconstructed basis. The owner-prepared year-by-year polyimide percentages in Section 9 further indicate that polyimide products account for 9.72% of

total unit volume on an aggregate basis, which materially limits the maximum potential profit attributable to that line even before reconstructed costs are applied.

## 12. DIRECT COSTS, SHARED COSTS, AND EXCLUDED / RESERVED COSTS

I distinguish among three groupings of cost in this Report.

### 12.1 Direct Costs

Direct costs are costs that I can assign to a specific product line on a documentary basis. For the accused polyimide line, these include raw Vespel SP-1 rod stock; outside processing of Vespel rod stock, including A.R. Warner Vespel rod cutting and Venture Precision Vespel CNC, both reflected on the 2016 Schedule C; polyimide-specific outside laser cutting and polishing, including the brown polyimide teardrops and brown polyimide large triangles invoiced by California Lasers Inc. on Invoice 32998, dated August 16, 2019 and paid August 20, 2019, in the amount of $1,673.16; shipping costs actually paid on polyimide orders; platform and payment-processing fees attributable to polyimide orders; and packaging materials used in polyimide shipments.

Where I can assign a direct cost to the polyimide line, I assign it directly rather than by proportional allocation.

### 12.2 Shared Shop Costs

Shared shop costs are costs used across both the polyimide and non-polyimide product lines and that I cannot cleanly assign to a specific product line on a documentary basis. These include abrasives, polishing and buffing supplies, tumbling media, general shop supplies, hand tools, machinery and equipment used across product lines, storage, business-related internet and software, and similar items.

I allocate these categories to the polyimide line using the Annual PI/Polyimide Percentage Allocation Method described in Section 10, applied year-by-year using the polyimide percentages in Section 9.2. Examples of shared-shop entries that appear in the Schedule C continuation statements include "tumbling/polishing machines $150" in 2017, "electric tools and shop machinery $1,928" in 2017, "supplies $876" in 2020, and "office expense $2,428" in 2020.

### 12.3 Expenses Not Presently Claimed, Quantified, or Included in the Primary Profit Calculation

I have elected, conservatively, to exclude or reserve the following categories from the primary profit calculation in this Report.

**Home or workshop occupancy costs.** I state that the business uses a substantial portion of my home and that I have photographs documenting workshop usage. However, none of the available Schedule C records for 2016, 2017, 2019, 2020, 2021, 2022, 2023, or 2024 reflect a claimed Schedule C Line 30 deduction for business use of home. Because the historical tax/accounting treatment did not separately claim a business-use-of-home expense in any available year, and because any business-use-of-home deduction would require additional support, I am not including home occupancy, home depreciation, or imputed rental value as a primary claimed deduction in this Report. I reserve that category for possible future treatment if and when documentary support is finalized.

 

**Mortgage interest as workspace allocation.** The 2020 Schedule C reflects "Mortgage interest $831." I am not, in this Report, attempting to retro-allocate any portion of mortgage interest to workspace use. I reserve that treatment.

**Indirect overhead and unquantified workspace burden.** I reserve categories of indirect overhead that have not been separately quantified, including additional unbilled time on customer service, marketing-content development, social-media maintenance, and other non-production support time.

**Expenses unrelated to the guitar-pick business.** I am not including as claimed deductions for the accused product line Schedule C Line 48 entries that appear unrelated, or only indirectly related, to the production and sale of guitar picks, including certain 2017 entries for guitar accessories, guitar pedals and pickups, audio CDs, and cables.

These categories may represent real business burdens, and several of them were expressly recognized on Charmed Life's federal tax filings in their respective years. My choice not to include them in the primary profit calculation is conservative and is intended to avoid overclaiming. I reserve the right to address any of these categories in a supplemental filing if appropriate documentary support is finalized.

## 13. PRE-2021 RECONSTRUCTION

The Court's Order requires sales information beginning March 2016. I have substantially documented the pre-2021 period at the unit level for every year and at the business level for every year except 2018.

**Schedule C records for 2016, 2017, 2019, and 2020.** These records are document-supported at the business level and provide aggregate gross receipts of $15,655 in 2016, $16,273 in 2017, $16,644 in 2019, and $17,729 in 2020, with corresponding net losses of $25,064, $2,797, $4,729, and $5,611, respectively. Each pre-2021 year for which Schedule C records are available reflects a net loss.

**Owner-prepared 2016–2020 unit-level summary.** My Section 9.2 owner-prepared summary identifies, on a year-by-year basis: 2016 — 352 total units / 51 polyimide units, or 14.49%; 2017 — 709 total units / 87 polyimide units, or 12.27%; 2018 — 850 total units / 109 polyimide units, or 12.82%; 2019 — 962 total units / 90 polyimide units, or 9.36%; and 2020 — 931 total units / 98 polyimide units, or 10.53%. This provides a complete year-by-year unit-level picture of the pre-2021 period, including 2018.

**Schedule C Line 48 continuation statements for 2016 and 2017.** These records provide detailed expense itemization for those two years, including direct entries for Vespel rod cutting by A.R. Warner in the amount of $1,262 in 2016, Venture Precision Vespel CNC in the amount of $1,878 in 2016, Drees Grinding in the amount of $880 in 2016, DuPont Vespel rods in the amount of $996 in 2017, and a number of other production and shop expenses.

**2018 reconstruction status.** The 2018 Schedule C remains unavailable. The 2018 unit-level data is now available through my Section 9.2 owner-prepared summary. I am reconstructing the 2018 revenue and net-profit/loss figures from the 2018 owner-prepared WIX summary, paper order logs, PayPal records, reseller/wholesale records, direct-sale records, event-sale records, bank statements, and any available expense documents. I will mark every reconstructed 2018 figure as a reconstructed estimate.



## CERTIFICATION

I, Scott Memmer, declare under penalty of perjury under the laws of the United States of America that the foregoing Administrative Financial Accounting Report is true and correct to the best of my knowledge, information, and belief, based on the records and information available to me as of the date set forth below. Where I have offered information as my own statement, as opposed to as document-supported, I have identified it as such; and where figures are reconstructed estimates, owner-prepared summaries, or proportional allocations, I have identified them as such.

I understand that this Report is being prepared in connection with the Court's April 9, 2026 Order in Case No. 2:25-cv-03167-RGK-AS, that I am the records custodian for Charmed Life Guitar Picks & Accessories, and that I will supplement this Report as additional records are located.

Executed this 11th day of May 2026, at Sunland, California.

**Scott Memmer**
**Owner / President / Records Custodian**